UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TAMIKA DEMETRICE HUDSON, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | No. 3:14-01239 |
| v. ) | Judge Sharp/Brown |
| ) | |
| CAROLYN W. COLVIN, ) | |
| ACTING COMMISSIONER ) | |
| OF SOCIAL SECURITY, ) | |
| ) | |
| **Defendant.** ) | |

**To: The Honorable Kevin H. Sharp, Chief United States District Judge.**

## REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration ("the SSA"), through its Commissioner ("the Commissioner"), denying plaintiff's applications for Supplemental Security Income (SSI) under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381 *et seq*. For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 14) be **DENIED** and the Commissioner's decision **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff filed protectively for SSI on June 16, 2010 alleging a disability onset date of March 21, 2006. (Doc. 10, pp. 52-53, 110-13)[1] Plaintiff claimed she was unable to work because of post traumatic stress disorder and manic depression. (Doc. 10, pp. 63, 74, 125) Plaintiff's claims were denied initially on December 8, 2010 and again upon reconsideration on July 19, 2011. (Doc. 10, pp. 59-62, 75-76)

---

[1] References to page numbers in the Administrative Record (Doc. 10) are to the numbers that appear in **bold** in the lower right corner of each page.

Plaintiff requested a hearing before an administrative law judge (ALJ) on September 15, 2011. (Doc. 10, pp. 77-79) A hearing was held on December 5, 2012 in Nashville before ALJ Michele Thompson. (Doc. 10, pp. 31-51) Vocational expert (VE) Donald Woodall testified at the hearing. (Doc. 10, pp. 46-50) Plaintiff was represented by attorney Robert Parker. (Doc. 10, p. 31)

The ALJ entered an unfavorable decision on January 11, 2013. (Doc. 10, pp. 11-26) Attorney Parker filed a request with the Appeals Council on February 8, 2013 to review the ALJ's decision. (Doc. 10, pp. 169-70) The Appeals Council denied the request on March 25, 2014, whereupon the ALJ's decision became the final decision of the Commissioner. (Doc. 10, pp. 1-5)

Counsel brought this action on plaintiff's behalf on May 28, 2014. (Doc. 1) Plaintiff filed a motion for judgment on the administrative record on September 23, 2014 (Doc. 14), the Commissioner responded on October 22, 2014 (Doc. 17), and plaintiff replied on October 31, 2014 (Doc. 18). This matter is now properly before the court.

## II. REVIEW OF THE RECORD

### A. Medical Evidence

Plaintiff was treated at the Centerstone Community Mental Health Center (Centerstone) during the period June 22, 2007 to August 17, 2008. (Doc. 10, pp. 171-217) An initial Clinically Related Group (CRG)[2] assessment was completed on June 22, 2007 at intake based on plaintiff's subjective representations. (Doc. 10, pp. 171-73) Plaintiff was assessed with moderate limitations in activities of daily living and adaptability, and marked limitations in interpersonal functioning, concentration, task performance and pace. (Doc. 10, pp. 171-72) Plaintiff was assigned to CRG

---

[2] The Tennessee Department of Mental Health characterizes CRG assessments as follows: "Clinically Related Group . . . assessments are used to provide operational definitions based on Federal guidelines for classifying mental health service consumers . . . ." Http://tennessee.gov/mental/omd/omdclinical_group.html

2

Group 2, *i.e.*, persons with severe illness, and given a Global Assessment of Functioning (GAF)[3] score of 50. (Doc. 10, p. 173) The CRG assessment was updated on November 7, 2007. (Doc. 10, pp. 174-176) The updated CRG assessment reflected moderate limitations in activities in daily living and adaptability, but only mild limitations in interpersonal functioning, concentration, task performance, and pace. (Doc. 10, pp. 174-75) Plaintiff was assigned to CRG Group 3, *i.e.*, persons formerly severely impaired, and again given a GAF score of 50. (Doc. 10, p. 176) Plaintiff was terminated from Centerstone on August 17, 2008 for lapse in treatment. (Doc. 10, pp. 216-17)

Plaintiff received treatment from the Mental Health Cooperative (MHC) from January 28, 2011 to September 17, 2012. (Doc. 10, pp. 232-50, 269-98) A CRG assessment was completed by MHC on January 28, 2011 at intake, again based on plaintiff's subjective representations. (Doc. 10, pp. 232-34) Assessment Clinician Melissa Webb-Oliver completed the assessment. (Doc. 10, pp. 239-42) The CRG reflected moderate limitations in activities of daily living, interpersonal functioning, concentration, task performance and pace, and marked limitations in adapting to change. (Doc. 10, pp. 232-33) Plaintiff was assigned to CRG Group 1, *i.e.*, persons with severe and persistent mental illness, and given a GAF score of 50. (Doc. 10, p. 234)

MHC Chief Medical Officer, Dr. Franklin Drummond, M.D., saw plaintiff on September 6, 2011. His medical assessment was that plaintiff "report[ed] some good early response to . . . zoloft . . . that her mood has been good and she feels like things are better." (Doc. 10, p. 287) The record shows that Dr. Drummond did not see plaintiff again.

Psychiatrist, Dr. Thomas Lavie, M.D., completed a mental status examination at MHC on June 11, 2012. His impressions were as follows:

---

[3] The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. *See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.1994).

> . . . . Attitude was cooperative. Demeanor was relaxed, sweet, open. She was alert, oriented and coherent. She was not tangential. There were no loose [*sic*] of associations evident, nor any evidence of incoherent thought flow. There was no current evidence of psychosis. There were no delusions voiced. There were no hallucinations revealed. Mood was euthymic,[4] easy smile and laugh. Affect was very full. Currently there was no evidence of mania or hypomania. Speech was normal rate, volume and rhythm. There was no evidence of pressured speech. Cognition and vocabulary was intact per educational level. There was no evidence of severe mental retardation. . . .

(Doc. 10, p. 275) Doctor Lavie completed a second mental status examination on October 17, 2012. His impressions that date were as follows:

> Current mental status exam is unremarkable for any significant psychopathology – quiet, pretty smile, hoop earrings. There was no evidence of psychosis, mania or hypomania. There was no major disturbance of affect (i.e., no flatness or inappropriateness of affect). Thought flow was coherent, not tangential or loose. No hallucinations currently. Not responding to internal stimuli. No delusions were revealed during this interview. Level of consciousness was stable and alert. There was no fluctuation in level of consciousness. There was no evidence of a movement disorder (i.e., no tremor or involuntary movements). There was no psychomotor retardation or psychomotor agitation. . . .

(Doc. 10, p. 271)

Doctor David Kirk, Ph.D., completed a consultive mental residual functional capacity (RFC) assessment on June 6, 2011. (Doc. 10, pp. 265-68) Doctor Kirk assessed plaintiff with moderate limitations in her ability to understand and remember detailed instructions, carry out detailed instructions, and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (Doc. 10, pp. 265-66) Doctor Kirk assessed plaintiff with no significant limitations in all of the remaining areas of understanding and memory, sustained

---

[4] Euthymia – "a state of mental tranquility and well being; neither depressed nor manic." *Dorland's Illustrated Medical Dictionary* 655 (32nd ed. 2012).

4

concentration and persistence, social interaction, and adaptation. (Doc. 10, pp. 265-66) Doctor Kirk made the following relevant notations in the narrative portion of his RFC assessment: 1) "The psychiatric medical evidence of record does not support any significant mental problems or restrictions"; 2) "Overall, the history and the evidence of the file d[oes] not support any significant mental problems or restrictions"; 3) "The claimant has the capacity to function independently and successfully in ADLs and basic tasks," although she "prefers to have others do things for her"; 4) "[T]he claimant retains a capacity to function independently and successfully." (Doc. 10, p. 268)

Julie Malone, LPC-MHSP,[5] completed a medical source statement (MSS) on October 4, 2012. (Doc. 10, pp. 299-301) Ms. Malone assessed plaintiff with moderate limitations in her ability to understand, remember, and carry out simple instructions, and marked limitations in her ability to make judgments on simple work-related decisions, understand, remember, and carry out complex instructions, and make judgments on complex work-related decisions. (Doc. 10, p. 299) Ms. Malone noted the following in connection with the limitations above: "I've noted that during our sessions I often have to repeat instructions and/or clarify homework assignments." (Doc. 10, p. 299) Ms. Malone also assessed plaintiff with marked limitations in every category related to her ability to interact appropriately with supervisors, co-workers, and the general public, as well as her ability to respond to change in the workplace. (Doc. 10, p. 300) Ms. Malone noted the following in connection with these marked limitations:

> Ms. Harvey[6] has been diagnosed w/major Depressive Disorder. She has bouts of tearfulness, hopelessness, lethargy, and diff[iculty] concentrating. It would be very difficult for her to keep employment w/these symptoms[.]

---

[5] Licensed Professional Counselor-Mental Health Service Provider.

[6] Plaintiff testified at the hearing that she also went by the last name "Harvey," which was her parents' last name. (Doc. 10, p. 42)

5

(Doc. 10, p. 300)

## B. Transcript of the Hearing

The transcript of the hearing is incorporated herein by reference, except as addressed below. Those parts of the transcript pertaining to Ms. Malone's MSS are addressed below for ease of reference in connection with plaintiff's first claim of error.

Counsel made the following statement about Ms. Malone and her relationship with plaintiff in his opening statement:

> We have a medical source statement from Julie Malone at 7F. And my understanding is that she is involved at . . . . [M]y understanding is that she is involved at Mental Health Co-op with [plaintiff], but I didn't see her name anywhere in the Mental Health Co-op records, so I may need to get a short note from her after the hearing, just stating that she treats [plaintiff] at [the] Mental Health Co-op . . . .

(Doc. 10, p. 35) The ALJ responded, "All Right." (Doc. 10, p. 35)

The following related colloquy between the ALJ and plaintiff followed council's opening statement:

Q      You go to the Mental Health Co-op. Is Ms. Malone someone you see every time you go, or do you see different people?

A      I see Ms. Julie Malone is my therapist. I see her twice a month.

Q      And how long have you been treating with her?

A      Since my son got killed back in '09 – back in 2006, March.[7]

Q      So since March, 2006 you've been going to see Ms. --

A      I been, yes.

Q      And you're still seeing her currently?

---

[7] As previously noted above at p. 3, the record shows that plaintiff first began her treatment at MHC on January 28, 2011. Plaintiff's testimony is inconsistent with the record by approximately 5 yrs.

A      Yes, ma'am.

(Doc. 10, pp. 36-37)

During the VE's testimony, the ALJ posed the following hypothetical to the VE based on the MSS provided by Ms. Malone:

> The person would have marked limitations in the ability to understand and remember complex instructions, and in the ability to make judgments on complex work-related decisions. The person would have marked limitations in the ability to interact appropriately with the public, with supervisors, with coworkers, and the ability to respond appropriately to usual work situation and to changes in the routine work setting. Under this hypothetical, would the individual be able to work?

(Doc. 10, p. 46) The VE responded, "No, ma'am . . . ." (Doc. 10, p. 49)

Following the VE's testimony, counsel asked the ALJ, "Do you want me to get a letter from Ms. Malone as to her relationship with the claimant?" (Doc. 10, p. 50) The ALJ answered, "No." (Doc. 10, p. 50)

### C. The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if she can show her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process to determine whether an individual is "disabled" within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2014). While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's RFC and vocational profile. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

The SSA's burden at step five may be met by relying on the *Medical-Vocational Guidelines*, known in the practice as "the grids," but only if the claimant is not significantly limited by nonexertional impairment, and then only when "the characteristics of the claimant exactly match the characteristics of one of the rules." *Wright v. Massanari*, 321 F.3d 611, 615 (6th Cir. 2003). In cases where the grids do not direct a conclusion as to the claimant's capacity, the SSA must come forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through the testimony of a VE. *See Wright*, 321 F.3d at 616 (citing SSR 83-12, 1983 WL 31253 (SSA)). In determining the claimant's RFC for purpose of the analysis at steps four and five, the SSA is required to consider the combined effect of all the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); 20 C.F.R., 404.1523; 404.1545(a)(2); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 725-26 (6th Cir. 2014).

### III. ANALYSIS

#### A. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374. Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Gentry*, 741 F.3d at 722. The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *Gayheart*, 710 F.3d at 374. "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006).

The ALJ determined that plaintiff had the RFC to perform the full range of work at all exertional levels with the following nonexertional limitations: 1) limited to simple instructions; 2) able to maintain concentration, persistence, and pace for 2 hrs. at a time; 3) able to interact with others, but would work best in proximity with others rather than in conjunction with them; 4) able to adapt to infrequent changes that are introduced gradually. (Doc. 10, p. 18)

### B. Claims of Error

#### 1. Whether the ALJ Properly Considered and Weighed the Opinion of Julie Malone, LPC-MHSP
#### (Doc. 14-1, pp. 5-9)

Plaintiff asserts in her first claim of error that the ALJ failed to consider the MSS prepared by Ms. Malone in accordance with SSR 06-3P. (Doc. 14-1, pp. 5-9) More particularly, plaintiff argues that: 1) the reasons for the different weight given to various portions of the MSS are not clear; 2) the ALJ uses boilerplate language rather than considering the record as a whole; 3) the ALJ erred in failing to consider each and every element of the MSS; 4) the ALJ cited to only those records that supported her decision.

"Acceptable medical sources" who can provide evidence to establish an impairment generally include "licensed physicians (medical or osteopathic doctors)" and "[l]icensed or certified psychologist[s]." 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2). Ms. Malone is neither a physician nor a psychologist. However, "other sources" who may provide evidence to show the severity of an impairment and how it affects the ability to work include Ms. Malone, a Licensed Professional Counselor. *See* 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1). Under SSR 06-3p, the ALJ is required to consider all relevant evidence in the record, including the opinions of "other sources" such as Ms. Malone. *Gayheart*, 710 F.3d at 378; *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011).

The Sixth Circuit has "held that an ALJ has discretion to determine the proper weight to

9

accord opinions from 'other sources'...." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007)(citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir.1997)). Although the opinions of "other sources" cannot establish the existence of a disability, their perspective should be given weight by the adjudicator and should be "evaluated on key issues such as impairment severity and functional effects, along with the other evidence in the file." *Cruse*, 502 F.3d at 541 (quoting SSR 06–03P). More particularly, SSR 06-03P provides that:

> [a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions for these 'other sources, **or** otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06–03P, 2006 WL 2329939 at *7 (emphasis added).

Those portions of the decision where the ALJ addressed the MSS prepared by Ms. Malone are quoted below:

> Licensed professional counselor Julie Malone reported that she often had to repeat instructions and/or clarify homework assignments during her sessions with the claimant. She also opined that the claimant would have difficulty keeping employment due to her bouts of tearfulness, hopelessness, lethargy, and difficulty concentrating . . . . However, little weight is given this opinion. Ms. Malone is not an acceptable medical source. Further, the record does not identify what role she played in the claimant's treatment, as her name is not found in the record, other than the medical source statement she provided . . . .[8] Finally, her opinion is inconsistent with the claimant's treatment record showing mood improvement with medication, her generally normal mental status examinations, her lack of psychiatric hospitalizations, and her conservative mental

---

[8] Council's offer to "get a letter from Ms. Malone as to her relationship with the claimant," discussed above at p. 7, would not have resolved the fact that Ms. Malone's name does not appear anywhere in the 19-plus months covered by the MHC records.

10

health treatment.

(Doc. 10, pp. 20, 171-298)[9]

> Great weight is given to the opinion of Ms. Malone that the claimant can satisfactorily understand, remember, and carry out simple instructions . . . . This opinion is supported by the opinion of the State agency psychological consultant, who is an acceptable medical source and based his opinion on a review of the record . . . .
>
> Little weight is given to the opinion of Ms. Malone that the claimant has a substantial loss of ability to function in her ability to interact appropriately with the public, co-workers, and supervisors . . . . Rather the undersigned finds the opinion of the State agency psychological consultant, that the claimant can relate appropriately with co-workers and supervisors to be more consistent with the record . . . .
>
> Limited weight is given to the opinion of Ms. Malone that the claimant has a substantial loss of ability to function in her ability to respond appropriately to usual work situations and to changes in a routine work setting . . . . Rather, the undersigned finds that the record supports that the claimant can adapt to infrequent changes that are introduced gradually.

(Doc. 10, pp. 21, 268)

The excerpts from the decision above show that: 1) the ALJ gave due consideration to the MSS prepared by Ms. Malone; 2) the reasons the ALJ gave for the weight she gave to the various parts of the MSS are sufficiently clear to permit subsequent reviewers to follow the ALJ's reasoning; 3) the ALJ's decision took into consideration the entire record; 4) the ALJ's decision is supported by substantial evidence.

Plaintiff's first claim of error is without merit.

### 2. Whether the ALJ Properly Considered the January 28, 2011 CRG Assessment

---

[9] Multiple references to the record in the analysis include not only the ALJ's decision, but the pages in the record to which the ALJ refers in her decision.

**(Doc. 14-1, pp. 10-12)**

Plaintiff argues that the ALJ erred in failing to state how much weight she assigned to the CRG assessment completed at MHC on January 28, 2011. (Doc. 14-1, p. 10) Noting on the one hand that "the mandate of [20 C.F.R.] § 404.1527 does not technically apply to the opinions expressed in the CRG assessment forms," plaintiff asserts nevertheless that the CRG assessment at issue was an opinion from "other sources," and that the ALJ had a duty to explain how much weight she assigned to it. (Doc. 14-1, p. 10)

Those portions of the decision in which the ALJ addressed the CRG at issue, are quoted below:

> . . . . At intake on January 28, 2011, a Tennessee Clinically Related Group (CRG) form was completed on the claimant based on her self-reports . . . . She was placed in Group 1 of persons with severe and persistent mental illness, and assessed a global assessment of functioning (GAF) score of 50, indicating serious impairment . . . . She was assessed with moderate limitations in activities of daily living because she reported difficulty completing household tasks. She was assessed with moderate limitations in interpersonal functioning because she reported being easily intimidated by others and had minimal contact with friends and family. . . . She was assessed moderate limitations in concentration, task performance, and pace because she reported she could not focus when trying to read, watch television, or talk to others, and had difficulty completing household tasks. She was assessed with marked limitations in her ability to adapt to change because she reported audio hallucinations of her deceased son, who was shot and killed in 2006, and had flashbacks of her deceased son, and her house fire in 2008 . . . . The claimant also described symptoms of poor sleep, poor focus, irritability, lack of energy, fatigue, and anhedonia.[10] She reported that she did not go out to socialize with friends or family, but lived with a friend and used public transportation. . . .

(Doc. 14-1, p. 19) As shown above, the ALJ discussed the CRG assessment at issue at length. The

---

[10] Anhedonia – "total loss of feeling of pleasure in acts that normally give pleasure." *Dorland's* at 91.

next question is whether the ALJ explained how much weight she gave to the CRG assessment. It does not appear from the record that she did. Therefore, the question becomes whether the ALJ was required to provide an explanation.

The Magistrate Judge notes as an initial matter that there is no Sixth Circuit case law addressing whether the ALJ is required to consider a CRG assessment, much less how much weight to give it. However, this court determined recently that the ALJ "was not bound to accept" CRG assessments because, just as GAF scores are not determinative of disability, neither are CRG assessments. *See Jones v. Soc. Sec. Admin.*, Slip Copy, 2015 WL 1235039 at * 10 (M.D. Tenn., 2015, Trauger, J.)(citing *Oliver v. Comm'r of Soc. Sec.*, 415 Fed.Appx. 681, 684 (6th Cir. 2011); *Kennedy v. Astrue*, 247 Fed.Appx. 761, 766 (6th Cir. 2007); *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 511 (6th Cir.2006); *Rutter v. Comm'r of Soc. Sec.*, 1996 WL 397424 at *2 (6th Cir. 1996)). Each of the cases cited by *Jones* above is analyzed in terms of GAF scores, and then that analysis is applied in the context of CRG assessments in *Jones*. The inference to be drawn from *Jones* is that GAF scores and CRG assessments are to be treated the same analytically. That said, the Sixth Circuit *has held* that the ALJ is "not required to consider . . . GAF scores." *Keeler v. Comm'r of Soc. Sec.*, 511 Fed.Appx. 472, 474 (6th Cir. 2013)(citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241. (6th Cir. 2002)). Given that *Jones* stands for the proposition that GAF scores and CRG assessments are to be treated the same, and given that *Keeler* provides that an ALJ is "not required to consider . . . GAF scores" at all, then the ALJ did not err by giving zero weight to the CRG assessment at issue without benefit of any explanation.

Even if it were determined on subsequent review that GAF scores and CRG assessments are not to be treated the same analytically, the ALJ's treatment of the CRG at issue also is supported by the fact that Ms. Webb-Oliver is not an "acceptable source," rather she is considered an "other

source." Because Ms. Webb-Oliver is an "other source," and not an "acceptable source," the ALJ was not required under the regulations to elaborate on her treatment of the CRG assessment at issue. *See Norris v. Comm'r. of Soc. Sec.*, 461 Fed.Appx. 433, 439 (6th Cir. 2012)("[A]n ALJ need only explain its reasons for rejecting a treating source statement because such an opinion carries 'controlling weight' under the SSA.")(citing *Smith v. Comm'r. of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)("[T]he SSA requires ALJs to give reasons for only *treating* sources." (italics for emphasis in the original)). In short, the ALJ was not required under *Norris* and *Smith* to explain the weight she gave to the CRG assessment at issue.

Plaintiff's second claim of error is without merit.

### 3. Whether the ALJ Properly Evaluated and Assessed the Credibility of Plaintiff's Statements as Required by SSR 96-7P (Doc. 14-1, pp. 12-14)

Plaintiff argues that the ALJ did not assess the credibility of plaintiff's statements as required by SSR 96-7P. The ALJ is required under SSR 96-7P to make a credibility determination after a physical or mental impairment has been established, and that the impairment(s) could reasonably be expected to produce the symptoms inhibiting work activities. SSR 96-7P, 1996 WL 374186 at *2 (July 2, 1996).

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference . . . ." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009)(quoting *Walters*, 127 F.3d at 531). An ALJ's credibility assessment will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The Sixth Circuit has "held that an administrative law judge's credibility findings are virtually 'unchallengeable.'" *Ritchie v. Comm'r of Soc. Sec.*, 540 Fed.Appx. 508, 511 (6th Cir. 2013)(quoting *Payne v. Comm'r of Soc. Sec.*, 402 Fed.Appx. 109, 112-13 (6th Cir. 2010)). That said, however, "an ALJ's assessment of a claimant's

credibility must be supported by substantial evidence." *Calvin v. Comm's of Soc. Sec.*, 437 Fed.Appx. 370, 371 (6th Cir. 2011)(quoting *Walters*, 127 F.3d at 531). Moreover, the ALJ is required to "explain h[er] credibility determinations in h[er] decision such that it 'must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007)(quoting SSR 96–7p).

The ALJ stated in her decision that "the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely credible for the reasons explained in this decision." (Doc. 10, p. 19) The ALJ made the following specific credibility-related observations:

> . . . . [Plaintiff's] mother reported that she spent her time talking on the phone of sitting with a friend on a daily basis . . . . She [also] reported that [plaintiff] got out on a daily basis, used public transportation, went shopping every other week, and went to church . . . .

(Doc. 10, pp. 17, 139, 141-42)

> . . . . She reported that she did not go out to socialize with friends or family, but lived with a friend and used public transportation.
>
> The claimant's medical doctor assessment on February 3, 2011 noted that she . . . was alert and cooperative. . . . Her thoughts were linear, logical, and goal directed. Her speech was normal. She showed no psychomotor agitation/retardation. Her judgment/impulse control was intact. Her insight was fair.

(Doc. 10, pp. 19, 237, 243)

> On March 3, 2011, the claimant reported to her case manager that her mood had been getting better, and that the medications helped more as 'the days go by.'. . . This was different than what she told her nurse and doctor. She told them that she was doing 'not so well,' and that she did not believe her medications were working for her . . . .

15

> .... When she was on her medications her mood was generally good, and she did relatively well .... On December 13, 2011, she told her case manager that she had been taking her medications .... However, she told her nurse that she did not pick up her medication refills the previous month.... On June 11, 2012, she reported doing well managing her mood on her medications. She wanted to get independent housing, and was trying to get into the Nashville Metro General Program ....
>
> Her mental status evaluations were generally very normal throughout this period .... Her mental status examination on September 17, 2012 by psychiatrist Dr. Thomas Lavie noted she was unremarkable for any significant psychopathology. There was no major disturbance of affect. Her thought flow was coherent, and not tangential or loose. She had no hallucinations. She was not responding to internal stimuli. No delusions were revealed. Her level of consciousness was stable and alert, with no fluctuation. There was no evidence of a movement disorder. There was no psychomotor retardation or agitation. She denied current suicide ideations, intent, or plan. Dr. Lavie diagnosed her with depressive disorder versus adjustment disorder with depression, major depressive disorder without psychotic features, and rule out post-traumatic stress disorder ....

(Doc. 10, pp. 20, 247-48, 273-74, 280, 284, 287)

> .... The claimant and her mother reported that she got confused and could not follow directions well. However, the record indicates that the claimant could remember what she want to remember, as the claimant's mother reported that the claimant needed reminders to take her medication, but did not need reminders to take care of her personal needs or grooming. The claimant and her counsel reported she had not problems managing her financial affairs.
>
> .... Although the claimant alleged severe limitations with social interaction, she lived with a friend, and spent time on the phone or sitting with a friend on a daily basis. She reported spending a lot of time with her children. She could use public transportation, go out shopping, and went to church.

(Doc. 10, p. 21)

While there is not a specific section in the decision where the ALJ summarizes her reasoning, the excerpts above show that: 1) the ALJ provide ample reasons to support her credibility

16

determination; 2) those reasons are sufficiently specific that plaintiff as well as subsequent reviewers would understand the ALJ's reasoning; 3) the ALJ's credibility determination is supported by substantial evidence.

Plaintiff's third claim of error is without merit.

## IV.  RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 14) be **DENIED** and the Commissioner's decision **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein.  A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof.  Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal.  *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 22nd day of April, 2015.

/s/ Joe B. Brown
Joe B. Brown
United States Magistrate Judge